UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

GRAND RABBI YECHIEL MECHEL
TWERKSY and PINCHAS TWERSKY,

        Plaintiffs,

                v.

TOWN OF HEMPSTEAD, TOWN OF
HEMPSTEAD BUILDING DEPARTMENT,
GRAND RABBI YITZCHOK TWERSKY
and RABBI DUVID TWERSKY,

           Defendants/Intervenor-Defendants.

---------------------------------------------------------------x

**MEMORANDUM & ORDER**

10 CV 4573 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiffs Yechiel Mechel Twersky and Pinchas Twersky filed the above-captioned action against Defendants Town of Hempstead and Town of Hempstead Building Department (the "Town Defendants") pursuant to 42 U.S.C. § 1983, the Federal Religious Land Use and Institutionalized Persons Act ("RLUIPA") and New York state law. Yitzchok Twersky and Duvid Twersky (the "Intervenors") filed a motion to intervene, which was granted by Judge Spatt.[1] Plaintiff then filed an Amended Complaint to bring a claim against the Intervenors for interference with property rights under New York state law. All parties moved for summary judgment. The Court heard argument on August 7, 2012. For the reasons set forth below, the motions for summary judgment filed by the Town Defendants and Intervenors are granted and the motion for summary judgment filed by Plaintiff is denied.

---

[1] This action was reassigned to the undersigned on March 30, 2012.

### I.    Background

This action is, at its core, a family dispute.  In 1928, Isaac Twersky purchased a burial

plot (the "Twersky Plot") at the Beth David Cemetery (the "Cemetery").  (Town Def. 56.1 ¶ 12.)

When Isaac Twersky died, the ownership of the Twersky plot passed to his three sons — Aaron

Twersky, David Twersky and Mordecai Twersky.  *Id.* at ¶ 13.  Beginning in the 1960s, a rift

formed within the Twersky family, as a result of which, David Twersky and Mordecai Twersky

were no longer speaking at the end of their lives.  (Pl. 56.1 ¶ 49; Pl. Summ. J. Mem. 7–8.)  David

Twersky died in 2001 and Mordecai Twersky died in 2007.  (Pl. 56.1 ¶ 6.)  The Twersky Plot is

now owned by the seven children of David Twersky and the seven children of Mordecai

Twersky.[2]  (Town Def. 56.1 ¶ 14; Pl. Summ. J. Mem. 5.)  Plaintiffs Yechiel Mechel Twersky and

Pinchas Twersky are the sons of David Twersky, and Intervenors Yitzchok Twersky and Duvid

Twersky are the sons of Mordecai Twersky.  (Town Def. 56.1 ¶¶ 10–11.)

After David Twersky died, Plaintiffs wished to build an *ohel* over his grave.  An *ohel* is a

"stand-alone structure customarily built over the graves of righteous scholars and leaders of the

Hassidic Jewish community."  (Pl. Summ. J. Mem. 5.)  According to Plaintiffs, "[u]nder Jewish

tradition and law as interpreted by the Skwere Hassidic community, a structure known as an *ohel*

is customarily built over the grave of a rabbi of great stature and respect in the Jewish

community."  *Id.*  In 2001, Plaintiffs met with Warren Rosen, President of the Cemetery, to

discuss building the *ohel*.  (Town Def. 56.1 ¶ 23.)  On February 22, 2001, S. Greenbaum

Monuments sent documents to Rosen regarding the proposed *ohel*.  *Id.* at ¶ 24.  Rosen provided

S. Greenbaum Monuments with a "Foundation Order Correction List," which indicated that

notarized permission must be obtained from Mordecai Twersky, the heirs of Aaron Twersky and

---

[2] Aaron Twersky died in 1995 without any children.  (Pl. 56.1 ¶ 6.)

the heirs of David Twersky.  *Id.* at ¶ 25.  Mordecai Twersky, father of the Intervenors, advised Rosen that he objected to the *ohel*.  *Id.* at ¶¶ 38, 49.

In 2007, Plaintiffs began building the *ohel*.  (Pl. Summ. J. Mem. 11.)  In March of 2008, Intervenor Duvid Twersky's brother visited the Cemetery and saw the partially-built walls of the *ohel*.  (Town Def. 56.1 ¶ 50.)  The Intervenors, like their father Mordecai Twersky, objected to the building of the *ohel*.  *Id.* at ¶ 55.  On March 17, 2008, Intervenor Duvid Twersky wrote a letter to Raymond Schwarz, Supervisor of Inspection Services at the Town Building Department, advising him that a structure was being built on a burial plot without his consent, as a co-owner. *Id.*  Schwarz asked Charles Vollmer, an inspector with the Town Building Department, to go to the Cemetery and inspect the structure.  *Id.* at ¶ 64.  Schwarz determined that a building permit was necessary because the *ohel* would be open to the public and people were likely to assemble within the *ohel*.[3]  *Id.* at ¶¶ 60, 66.  On March 20, 2008, Schwarz issued a "Stop Work Order" on construction of the *ohel*.  *Id.* at ¶ 68.  Schwarz sent a letter to the Cemetery advising it of the Stop Work Order and informing the Cemetery that if the plot owners wished to file a building permit, the Cemetery would have to sign the application, as property owner.  *Id.* at ¶ 71.  Rosen advised the Town that the Cemetery would sign the application if all the plot owners consented to the building of the *ohel*.  *Id.* at ¶ 57.  On April 19, 2008, Intervenor Duvid Twersky wrote a letter to Rosen stating that his co-ownership of the burial plot was being violated by the construction of the *ohel* because the Intervenors did not consent to the construction.  *Id.* at ¶ 56.

Around May 6, 2008, Plaintiffs submitted a building permit application, but the application was not signed by the Cemetery.  *Id.* at ¶ 44.  Mark Schwarz, a Building Plans Examiner for the Town Building Department and brother of Raymond Schwarz, reviewed

---

[3] Plaintiffs are not challenging the Town's requirement that Plaintiffs obtain a building permit in order to build the *ohel*.  (Pl. Summ. J. Mem. 16.)

Plaintiffs' application and issued a Planning Department Objection Sheet.  (Pl. Summ. J. Mem. 14; Declaration of Donna A. Napolitano ("Napolitano Decl.") Ex. V at 1.)  The objection sheet indicated that "[a]n authorized member . . . of the cemetery must sign the application." (Napolitano Decl. Ex. V at 1.)  No further review of the application was conducted.  *Id.*  On June 9, 2008, the Town informed Plaintiffs that a variance was necessary in order to continue construction of the *ohel*.  (Town Def. 56.1 ¶ 81.)  In February 2009, the Town notified Plaintiffs that a variance was not actually required.  *Id.* at ¶ 82.  However, Plaintiffs were informed that they needed, among other things, to "[p]rovide a completed application signed by the property owner and notarized."  (Napolitano Decl. Ex. V at 2.)  On January 13, 2009 and July 19, 2010, a Department of Buildings' Notice of Violation was generated due to the inactivity on Plaintiffs' application.  (Town Def. 56.1 ¶¶ 74–75.)

Plaintiffs then filed the instant action alleging violations of Plaintiffs' rights under the First Amendment, RLUIPA[4] and Article 78, as a result of the Town Defendants refusal to consider their building permit application without the Cemetery's signature.  Plaintiffs also argue that the Intervenors have interfered with their property rights in violation of New York state law. Discovery is now complete and all parties have moved for summary judgment.

## II.  Discussion

### a.  Federal Law Claims

The Town Defendants argue that Plaintiffs' First Amendment and RLUIPA claims are not ripe.  Ripeness is a jurisdictional inquiry, and courts are obliged to consider the ripeness issue

---

[4] RLUIPA prohibits a governmental entity from applying a land use regulation "in a manner that imposes a substantial burden on the religious exercise of a person . . . or institution, unless the government demonstrates that imposition of the burden . . . is in furtherance of a compelling governmental interest; and . . . [the burden imposed] is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc(a)(1).

first.  *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 110 (2d Cir. 2009); *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005).  The court "must presume that [it] cannot entertain [a plaintiff's] claims 'unless the contrary appears affirmatively from the record.'" *Murphy*, 402 F.3d at 347 (quoting *Renne v. Geary*, 501 U.S. 312, 316 (1991)).  In a land use dispute, the plaintiff has a "high burden" of proving that the court "can look to a final, definitive position from a local authority to assess precisely how they can use their property."  *Id.*  In determining whether a case is ripe, the court is to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Id.* (quoting *Abbot Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

The Second Circuit has articulated four factors for the court to consider in assessing whether a case is ripe in the context of land use disputes:  (1) whether a requirement that the plaintiff "obtain a final decision from a local land use authority aids in the development of a full record;" (2) whether the property owner has exhausted the variance process; (3) whether "a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes;" and (4) whether federalism principles further support a requirement of finality.  *Id.* at 348 (citing *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 187, 190 (1985)); *see also Lost Trail LLC v. Town of Weston*, 289 F. App'x 443, 445 (2d Cir. 2008) (summary order) ("Absent such final determinations, any review of plaintiff's constitutional claims would proceed without: (1) development of a full record, (2) precise demonstration of how local regulations will be applied to particular property, (3) resolution of whether a variance or subdivision approval might provide the relief plaintiff seeks, and thus (4) would risk undue interference in matters of local concern

5

more aptly suited for local resolution." (citations and internal quotations omitted)).

Nevertheless, a plaintiff "will be excused from obtaining a final decision if pursuing an appeal to

a zoning board of appeals or seeking a variance would be futile." *Murphy*, 402 F.3d at 349.

The Second Circuit has held that it is not "necessary to distinguish the RLUIPA claim

from the First Amendment Free Exercise claim when it comes to our ripeness inquiry." *Id.* at

350. However, "in the First Amendment context, the ripeness doctrine is somewhat relaxed."

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002). The

court must, therefore, conduct a preliminary inquiry to determine whether or not the ripeness

analysis should be applied: (1) whether the plaintiffs experienced an immediate injury as a result

of the defendants' actions, and (2) whether requiring the plaintiffs to pursue additional

administrative remedies would further define their alleged injuries. *Murphy*, 402 F.3d at 350–51

(citing *Dougherty*, 282 F.3d at 90); *see also Roman Catholic Diocese of Rockville Ctr., N.Y. v.*

*Inc. Vill. of Old Westbury,* No. 09 Civ. 5195, 2011 WL 666252, at *19 (E.D.N.Y. Feb. 14, 2011)

(the court must first determine whether application of the ripeness test is appropriate).

The Court finds that the four-factor ripeness analysis should be applied in the instant

action. First, Plaintiffs have failed to demonstrate that they experienced an immediate injury as a

result of the Town Defendants' actions. Plaintiffs claim that they suffered an immediate injury

by the refusal to process their permit application because they are prevented from memorializing

their father. (Pl. Opp'n Summ. J. 4.) However, courts have repeatedly rejected claims of

"immediate injury" based on a defendant's refusal to grant or process a building permit. *See*

*Roman Catholic Diocese of Rockville Centre, N.Y.*, 2011 WL 666252, at *19 (finding no

immediate injury where "no decision had been rendered either approving or denying the

[plaintiff's] special permit application"); *Osborne v. Fernandez*, No. 06 Civ. 4127, 2009 WL

6

884697, at *5 (S.D.N.Y. Mar. 31, 2009), *aff'd*, 414 F. App'x 350 (2d Cir. 2011) (rejecting the plaintiffs' claim of alleged injury based on the alleged "delay and bad faith in the processing of their application and loss of desired use of their property"). If a plaintiff were able to establish an immediate injury as soon as his or her permit application was denied, even though he or she had not exhausted the appeals or variance process, the finality requirement would be meaningless. The Court finds that Plaintiffs have failed to allege an "immediate injury" because the only injury alleged is the "loss of desired use of their property" as a result of the refusal to process their building permit application. *Osborne*, 2009 WL 884697, at *5. Second, as discussed in more detail below, an appeal to the zoning board will more clearly define Plaintiffs' alleged injuries — i.e. whether the plan examiner properly interpreted the building code; the Town's interest in so applying its code; and whether the Town's enforcement of the code in this manner "evinces discriminatory enforcement." *Murphy*, 402 F.3d at 351. Having found that Plaintiffs have not alleged an immediate injury and that additional administrative remedies would further define Plaintiffs' injuries, the Court turns to the four-factor ripeness analysis.

Plaintiffs have not established that this Court can look to a "final, definitive position" from the local authority. *Id.* at 347. As a preliminary matter, the Court rejects Plaintiffs' contention that they did not have any administrative remedies available to them. (Pl. Opp'n Summ. J. 5.) Town of Hempstead Building Zone Ordinance § 267 specifically provides that the Zoning Board of Appeals "shall have the powers granted by the Town Law" as well as additional powers set forth in the ordinance. Town of Hempstead Building Zone Ordinance § 267(D). New York Town Law provides that the Zoning Board of Appeals has jurisdiction to hear an appeal from "any order, requirement, decision, interpretation, or determination made by the administrative official charged with the enforcement of any ordinance or local law adopted

7

pursuant to this article." N.Y. Town Law § 267-a(4). "Such appeal may be taken by any person aggrieved, or by an officer, department, board or bureau of the town." *Id.* Plaintiffs dispute the plan examiner's interpretation of the Town of Hempstead Building Code § 86-9(B). Section 86-9(B), in relevant part, provides that, where a building permit application is "made by a person other than the owner, it shall be accompanied by an affidavit of the owner or applicant that the proposed work is authorized by the owner and that the applicant is authorized to make such an application." Town of Hempstead Building Code § 86-9(B). Mark Schwarz, the Building Department's plan examiner, interpreted that portion of the building code to require that Plaintiffs' application include the signature of the Cemetery, the owner in fee of the property. (Napolitano Decl. Ex. V at 1 ("An authorized member, of the ownership corporation, of the cemetery must sign the application.").) Plaintiffs claim that, as plot owners, they should not be required to have the Cemetery's signature on the building permit application. Because Plaintiffs are challenging the plan examiner's interpretation of the building code, they could have, and should have, appealed the plan examiner's interpretation of the code to the Zoning Board of Appeals.[5] *See E. End Eruv Ass'n, Inc. v. Vill. of Westhampton Beach*, 828 F. Supp. 2d 526, 537–38 (E.D.N.Y. 2011) (finding that the claim was not ripe because the plaintiffs should have appealed the building department's interpretation of the building code to the zoning board of appeals).

---

[5] Plaintiffs argue that the signature of the Cemetery was not required under the policy, and, therefore, they are not challenging the interpretation of the building code, but rather claiming that the examiner violated his duty by failing to process the application. (Pl. Summ. J. Reply 5.) As a result, Plaintiffs argue that the only review available to them was in the nature of mandamus and a plaintiff is not required to file a mandamus proceeding in order to exhaust state remedies. *Id.* In order to find that the Cemetery's signature was not required under the building code, the examiner must first have found that the plot owners are the "property owner" for the purposes of a building permit application. Thus, even under this framework, Plaintiffs' claim is premised on a dispute regarding the interpretation of "owner" in the building code.

Furthermore, requiring Plaintiffs to appeal to the zoning board would aid "in the development of a full record." *Murphy*, 402 F.3d at 348.  Plaintiffs' claims are premised, in part, on their contention that because Schwarz did not consult with anyone in determining that the building code required the Cemetery's signature, his application of the code was not a neutral policy of general applicability.  (Pl. Summ. J. Mem. 20–21.)  Plaintiffs argue that the "purported 'policy' requiring the signatures of the Cemetery and the Intervenors appears to have been largely an invention of Plans Examiner Schwarz." *Id.* at 23.  Yet, Plaintiffs did not appeal Schwarz's interpretation, thereby affording the zoning board the opportunity to weigh in on the proper interpretation of its own local regulations.  Further development of the record will clarify whether the Cemetery's signature was required pursuant to a neutral town policy, or was, instead, a requirement invented by Schwarz.  If the zoning board finds that the Cemetery's signature was required under the building code, the zoning board will articulate the basis and policy reasons for this decision, which will further develop the record and aid in any constitutional analysis of the building code.[6]  *See E. End Eruv Ass'n*, 828 F. Supp. 2d at 537

---

[6] The next two factors look to whether the variance process is exhausted and whether a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes.  *Murphy*, 402 F.3d at 348.  Plaintiffs claim that Town Attorney Joseph Ra informed Plaintiffs that they could file an application for an area variance and that they would not need the signature of the Cemetery if their variance application was approved.  (Pl. Summ. J. Mem. 16.)  On July 27, 2010, Plaintiffs sent a letter to Ra, asking him for an explanation as to why an "area variance is necessary, as well as the section of the Town code that would require an application for an area variance in this instance."  (Affidavit of Robert Schonfeld ("Schonfeld Aff.") Ex. GG.)  Plaintiffs allege that Ra never responded.  Plaintiffs did not seek a variance, and, instead, filed the instant action three months later.  The record is not clear as to whether Plaintiffs could have sought a variance that would have permitted them to build the *ohel* on part of the Twersky plot without the consent of the Cemetery, or if Plaintiffs' counsel took any steps, aside from the letter to Ra, to attempt to exhaust the variance process.  Regardless, Plaintiffs could have filed an appeal and, therefore, even if a variance was not possible, Plaintiffs had an administrative remedy available that they did not pursue.

(noting that the zoning board of appeals is obligated to issue a decision "linking its conclusions to evidence in the record" (citations and internal quotations omitted)).

Moreover, federalism principles weigh in favor of a requirement of finality. *Murphy*, 402 F.3d at 348 ("[The finality requirement] evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution."); *Hunter v. Town of Chili, N.Y.*, No. 09 Civ. 6285, 2010 WL 598679, at *2 (W.D.N.Y. Feb. 18, 2010) (noting that "respect for federalism sustains the ripeness requirement"); *Grossi v. City of New York*, No. 08 Civ. 1083, 2009 WL 4456307, at *4 (E.D.N.Y. Nov. 30, 2009) ("[P]olicies of federalism and judicial restraint require that plaintiffs seek relief from local authorities before entering the federal courts."). Plaintiffs ask this Court to intervene and interpret the Town's building code, but the zoning board is in the best position to interpret the Town's building code. *See E. End Eruv Ass'n*, 828 F. Supp. 2d at 537–38 ("Mindful that land use disputes are uniquely matters of local concern more aptly suited for local resolution, the Court concludes that Southampton should be given the opportunity to determine whether lechis . . . are 'signs' within the meaning of the Sign Ordinance."). The Court finds that Plaintiffs have failed to meet their "high burden" of proving that there is a final, definitive decision from the local authority. *Murphy*, 402 F.3d at 347; *see also Lost Trail LLC*, 289 F. App'x at 444–45 (affirming the district court's finding that the plaintiff's claims were not ripe, where the plaintiff failed to appeal the rejection of its building permit application to the zoning board).

A plaintiff is excused from "obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile." *Murphy*, 402 F.3d at 349. An appeal would be futile where "a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." *Id.* Moreover, an appeal is not

necessary where the zoning board "sits purely as a remedial body" and is not empowered to participate in the decision making.  *Id.*  Plaintiffs have not offered any evidence to demonstrate that the zoning agency lacks discretion or has made clear that any such applications would be denied.  *See E. End Eruv Ass'n*, 828 F. Supp. 2d at 536 ("[C]onclusory or unsupported allegations of futility will not suffice.").  Nor can Plaintiffs establish that the zoning agency is a purely remedial body.  The central issue in this litigation is the proper interpretation of the meaning of "owner" under Section 86-9(B) of the building code.  Not only is the zoning board able to render a decision on that interpretation, but the zoning board is best situated to make that decision.  Plaintiffs have not established that an appeal to the zoning board would be futile.

Accordingly, the Court finds that Plaintiffs' claims are not ripe and the Court does not have jurisdiction.  Plaintiffs' First Amendment and RLUIPA claims are dismissed without prejudice.[7]

### b.  State Law Claims

Having dismissed Plaintiffs' federal law claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."); *Shenandoah v. U.S. Dep't of Interior*, 159 F.3d 708, 714 (2d Cir. 1998).

---

[7] Although the Court is dismissing the federal claims because it does not have jurisdiction, the Court questions whether, even after Plaintiffs have received a final decision from the zoning board, this action belongs in federal court.  This action is nothing more than a property dispute between family members that have been feuding for fifty years, and it should be resolved by the family, or, if such a resolution is not possible, in state court.

**III.    Conclusion**

For the foregoing reasons, the Court finds that Plaintiffs' federal claims are not ripe and the Court lacks jurisdiction.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  The Court grants the motions for summary judgment filed by the Town Defendants and the Intervenors, denies the motion for summary judgment filed by Plaintiff and dismisses the Amended Complaint in its entirety.  The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated: October 16, 2012
       Brooklyn, New York

12